**Slip Op. 05-45**

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

———————————————————————
|  | x |
| Sinopec Sichuan Vinylon Works, | : |
| Plaintiffs, | : |
| v. | **Court No. 03-00791** |
| United States, | : |
| Defendant | : |
| And | |
| Celanese Chemicals, Ltd. and E.I. DuPont De Nemours & Co., | : |
| Defendant - Intervenors. | : |
———————————————————————x

[Plaintiffs USCIT R. 56.2 Motion for Judgment upon an Agency Record granted in part and denied in part.]

Decided: April 4, 2005

*Gamey Schubert Barer*, *William E. Perry*, *Lizabeth R. Levinson*, (*Ronald M. Wisla*), *J. Patrick Briscoe* for Plaintiff.

*Peter D. Keisler*, Assistant Attorney General; *David M. Cohen*, Director; (*Jeanne E. Davidson*), Deputy Director; (*Stephen C. Tosini*), Trial Attorney, Department of Justice, Civil Division, Commercial Litigation Branch and *Ada E. Bosque*, Attorney-Advisor, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel for Defendant.

Wilmer Cutler Pickering Hale & Dorr LLP, (*Ronald I. Meltzer*), *Tammy J. Horn*, *Atman M. Trivedi* for Defendant-Intervenors.

**OPINION**

**BARZILAY, JUDGE:**

## I. INTRODUCTION

Plaintiff Sinopec Sichuan Vinylon Works ("SVW"), a Chinese producer and exporter of polyvinyl alcohol ("PVA") from the People's Republic of China ("China"), challenges the final determination of sales at less than fair value and the resulting antidumping duty order issued by the United States Department of Commerce, International Trade Administration ("Commerce" or "the Department" or "the Government") in *Polyvinyl Alcohol from the People's Republic of China*, 68 Fed. Reg. 47538 (2003), as amended 68 Fed. Reg. 52183 (2003) (finding PVA to be dumped in the United States by SVW and determining the final dumping margin to be 6.91 percent). Plaintiff contests Commerce's decisions (1) not to apply the "self-produced" rule to inputs produced by a joint venture; (2) to apply a value-based methodology to allocate costs between acetylene and acetylene tail gas instead of a heat of combustion-based methodology; (3) to use the ceiling price of published Indian natural gas prices as the surrogate value for natural gas rather than an average of published floor and ceiling prices; and finally, (4) Commerce's decision regarding when and how to apply a by-product credit in its calculation of Plaintiff's normal value. Commerce has requested remand of its use of the ceiling price for natural gas. For the reasons explained below, Plaintiff's USCIT R. 56.2 Motion for Judgment Upon an Agency Record is granted, in part, and the case is remanded to Commerce to reconsider its analysis with regard to issues (l), (3), and (4). Commerce's decision regarding issue (2) is affirmed.

## II. Background

For non-market economy ("NME") countries, section 773(c) of the Tariff Act of 1930 requires that Commerce calculate normal value using market economy prices to value the factors of production used in the NME country to produce the subject merchandise. 19 U.S.C. § 1677(b) (2003); Antidumping Duty Manual, Ch. 8 at 85. In its normal value calculation, Commerce valued costs of production by utilizing the financial statements of an Indian surrogate, VAM Organic Chemical Ltd. (subsequently, Jubilant Organosys Ltd.) ("Jubilant" or "the surrogate") to value factory overhead, general expenses and profit. *Def.'s Memo in Opp. to Pl.' Mot. for J. Upon the Agency Record* ("*Def.'s Memo*") at 3. Jubilant is a producer of polyvinyl acetate (PVAc), a product comparable to the PVA produced by SVW. The two manufacturers' production processes differ, however, in that SVW polymerizes vinyl acetate monomer ("VAM") into PVAc, and then converts it into PVA, while Jubilant processes ethanol into ethylene to derive VAM, which it then processes into PVAc. *Pl.'s Brief in Support of Mot. for J. on Agency Record* ("*Pl.'s Brief*") at 3. Jubilant does not follow through to the final stage for the production of PVA, where significant amounts of acetic acid are recovered. *Id.* SVW, on the other hand, does perform this final stage and, therefore, recovers acetic acid in the production of PVA.

On March 20, 2003, Commerce published its preliminary determination, where it reported a *de minimis* dumping margin. *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Polyvinyl Alcohol from the People's Republic of China*, 68 Fed. Reg. 13674 (March 20, 2003). Commerce's investigations revealed that SVW purchases acetic acid, one of the main inputs, from a joint venture partner within the

PRC. *Issues and Decision Memo* ("*I & D Memo*") at 3. For its preliminary determination, Commerce did not value the costs of producing acetic acid by the joint venture, but instead used a surrogate value from an Indian producer. *Id.* Commerce reasoned that the joint venture was neither a branch nor a division of SVW, and therefore, it was statutorily required to treat acetic acid as purchased from another NME supplier. *I & D Memo* at 3. SVW argued that Commerce should have treated acetic acid as a self-produced input because the joint venture supplier produces acetic acid within SVW's manufacturing site and supplies it directly to SVW through a connected pipe system. *Id.* at 5. Moreover, SVW argued that it owned a substantial minority interest in the joint venture, and that it decided to form this relationship because it would be more cost effective to produce the input than to purchase it. *Id.* To treat the joint venture as an arms-length supplier, SVW contended, would result in an inflated cost of production, since SVW obtains substantial economic benefits from its vertical integration with the joint venture. *Id.* at 5. Commerce rejected SVW's argument, and continued to treat acetic acid as a purchased input in its valuation rather than using SVW's costs of production. *I & D Memo* at 7.

Moreover, Commerce's investigation revealed that during the PVA production process, acetylene and acetylene tail gas are also recovered. *Def.'s Brief* at 4. For its preliminary determination, Commerce allocated the costs for these two products using a heat combustion methodology, as SVW did in its own records. *I & D Memo* at 17. Petitioners argued that tail gas should be treated as a co-product, rather than a by-product, and that SVW allocated more costs to tail gas than it did to acetylene, despite the latter's significantly higher market value. *Def.'s Brief* at 4. For its final determination, Commerce reasoned that "allocation of costs solely

on potential heats of combustion when the potential heat is not a factor in the process at hand is not reasonable given the vastly different market values of the joint products at issue," *I & D Memo* at 17, and ultimately used a "value based methodology." *Id.*; *I & D Memo* at 15-18.

In its investigation Commerce also used surrogate values for natural gas, a raw material input in the production of PVA, using values obtained from the Gas Authority of India, Ltd. ("GAIL"). *I & D Memo* at 22. Plaintiff challenged Commerce's use of GAIL's reported ceiling prices, arguing that Commerce should use an average of the reported ceiling and floor prices for natural gas, as opposed to the highest reported price, which the Department used. *Id.* In its final determination, Commerce rejected SVW's argument and continued to use the natural gas prices from the surrogate as it did in the preliminary determination, asserting that the lower prices were "only offered on preferential terms to customers in a particular geographic region." *I & D Memo* at 23.

Finally, during its calculations for the preliminary determination, Commerce utilized surrogate financial ratios for factory overhead, SG&A, and profit to calculate SVW's cost of production. *I & D Memo* at 25. Commerce also determined that the denominator of the financial ratios did not account for the significant quantity of the acetic acid by-product that SVW recovered during the final PVA production stage, and not experienced by the surrogate. *Id.* at 28. Therefore, to account for this discrepancy, Commerce applied the surrogate's financial ratios to SVW's costs prior to making an offset for the recovered by-product, with the goal of equating the base on which the ratios were calculated with that to which they were applied. *I & D Memo* at 25.

SVW suggested that Commerce should apply overhead, SG&A, and profit after granting

the by-product credit.  Petitioners, on the other hand, urged Commerce to adjust Jubilant's

financial statements to account for SVW's higher level of integration, which resulted in

differences in costs between the two manufacturers.  *Pl.'s Brief* at 4.  Commerce found that the

differences in material costs were due to differences in the production process, and not to capital

intensity or integration.  *I & D Memo* at 28.  Therefore, it refused to adjust the surrogate values,

and instead continued to apply Jubilant's ratios prior to offsetting for SVW's recovery of acetic

acid.  *Pl.'s Brief* at 5.

Commerce issued its final determination on August 11, 2003, in which it reported an

affirmative dumping margin of 7.40 percent.  *Polyvinyl Alcohol from the People's Republic of

China*, 68 Fed. Reg. 47538 (2003).  On September 2, 2003, Commerce published the

antidumping duty order with a reduced dumping margin of 6.91 percent, after correcting various

clerical errors.  *Polyvinyl Alcohol from the People's Republic of China*, 68 Fed.Reg. 52183

(2003).  It concluded that PVA from the PRC was being sold at less than fair market value within

the meaning of section 733(b) of the Tariff Act of 1930, as amended, 19 U.S.C.§ 1673b(b)

(1988).  Plaintiff SVW filed a complaint contesting Commerce's findings.

## III. DISCUSSION

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (2005).  In

reviewing Commerce's antidumping duty determinations, the court will sustain any

determination, finding, or conclusion by Commerce unless it is unsupported by substantial

evidence on the record or is otherwise not in accordance with law.  *See* 19 U.S.C. § 1516a(b)(l)

(2005); *Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Substantial evidence is "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938).

## A.   Application of the Self-produced Rule to Acetic Acid Inputs

In non-market economy antidumping proceedings, Commerce values respondent's factors of production utilizing the best available information from a market economy. 19 U.S.C. §1677b(c) (1994). Therefore, Commerce uses surrogate values from market economy manufacturers to value the costs of factors of production when it determines that this constitutes the best information available.

### 1.   Plaintiff's Arguments

Plaintiff argues, as it did during the agency investigation, that Commerce erred in utilizing a single surrogate price for acetic acid because SVW obtains the input from an affiliate, and therefore the self-produced rule applies. Plaintiff indicates that the self-produced rule has been upheld as an appropriate method for determining the most accurate dumping margin possible, even where the producer under investigation purchases from affiliates. To support this claim, SVW cites *CITIC Trading Co., Ltd. v. United States,* where the court upheld the self-produced rule as "reflective of the statute's overriding requirement for accuracy." 27 CIT ___, Slip Op. 03-23 (March 4, 2003).

Plaintiff contends that, as indicated in its responses to Commerce's questionnaires, it obtains acetic acid from an affiliated manufacturer, of which Plaintiff is a minority owner. Moreover, SVW maintains that it shares a manufacturing site with the affiliated supplier and that

the two operations are intertwined at the site. Thus, SVW argues that it enjoys economic benefits from its vertical integration with its supplier, and as such, Commerce's failure to apply the self-produced rule results in an inflated cost of production calculation.

Although Plaintiff concedes to Commerce's determination that the manufacturer is a separate legal entity, it argues that this distinction is not, or should not be, the dispositive factor. Plaintiff argues that Commerce should instead consider operational interdependence, along with Plaintiff's investment and interest in the joint venture. Thus, Plaintiff contends that Commerce failed to adequately explain why corporate organization is the decisive factor in determining whether merchandise is considered self-produced.

Furthermore, SVW claims that Commerce's use of the Indian surrogate value instead of SVW's own factors of production, resulted in an overstatement of SVW's costs. According to SVW, the Indian surrogate produces 20 different by-products, including acetic acid, while SVW produces only 9. Therefore, Plaintiff suggests that Commerce's failure to apply the credit for the costs of production would treat SVW as less integrated than Jubilant, and impute higher capital costs to SVW. Thus, applying Jubilant's overhead figures, as opposed to applying its prices to SVW's reported factors of production, overstates SVW overhead, as the former has higher capital costs. Application of the self-produced rule, SVW alleges, would alleviate this disparity.

### 2.      Defendant's and Defendant-Intervenors' Arguments

Commerce maintains that it is not required to apply the self-produced rule. It argues that there is no legal justification for treating the joint venture's factors of production as those of SVW. Doing so, Commerce suggests, would result in an undervaluation of the input, and

consequently an understatement of the normal value, undermining the accuracy of its calculation. Commerce contends that SVW does not incur the operation, maintenance, and depreciation related expenses of its supplier's plant, and that SVW and the joint venture are separate corporate entities. Finally, Commerce argues that to consider acetic acid as self-produced would require it to collapse SVW with the joint venture, while the collapsing factors have not been proven.[1]

Defendant-Intervenors, the domestic producers, argue that Commerce correctly valued SVW's acetic acid input using the Indian surrogate prices and not the factors of production. They contend that SVW does not self-produce the acetic acid because it is purchased from a separate company, which it "neither owns nor controls." *Defendant-Intervenors' Brief* at 9. They further argue that SVW failed to supply sufficient evidence to support its claim that it is vertically integrated with its supplier of acetic acid. According to Defendant-Intervenors, SVW's alleged physical proximity and minority ownership interest in the affiliate are not determinative factors for the application of the self-produced rule.

### 3. Analysis

It is well-established that section 773 of the Tariff Act of 1930 directs Commerce to base normal value on market economy figures for factors of production that are comparable, to the extent possible, with those of the NME producer. 19 U.S.C. § 1677b(c)(4) (2003). When obtaining data from such market economy-based surrogate producers, Commerce must base the

---

[1] Defendant has not provided any support for its claim that in order to consider acetic acid to be self-produced, it would have to collapse SVW and the joint venture. The court notes that under the present facts, the collapsing analysis is not applicable to this case, and without a more complete discussion of this issue than contained in the briefs, the court will not consider it further.

market economy figures on the best available information.  19 U.S.C. § 1677b(c)(1)(B) (2003).

While a factors of production methodology is specifically provided for in the statute, Commerce

is not restricted to the exclusive use of surrogate values in comparable market economies.  *See*

*CITIC Trading Co.,* 27 CIT __, Slip Op. 03-23, 47 (citing *Lasko Metal Products, Inc. v. United*

*States*, 16 CIT 1079, 1082, 810 F. Supp. 314, 317 (1992) (quotations omitted)).  Thus,

Commerce may use evidence of prices paid in the nonmarket economy country to

market-economy suppliers in combination with surrogate country information when valuing

factors of production.  *Lasko*, 810 F. Supp. at 316 (citing *Tianjin Mach. Import & Export Corp.*

*v. United States*, 806 F. Supp. 1008, 1018 (1992)).  Additionally, as Plaintiff points out,

Commerce has in the past relied on costs of self-produced inputs rather than surrogate values

where it could value the materials, energy, and labor employed to manufacture the input.  *CITIC*

*Trading Co.*, Slip Op. 03-23 at 47 (citations omitted).  At oral argument, the government

indicated that the "bright line rule" for determining when an input is considered self-produced is

whether control over the affiliated producer can be exercised, but admitted that "a party can rebut

this presumption based upon certain factors concerning that party."  *Oral Arg. Tr.* at 26.

Commerce has failed, however, to sufficiently explain why corporate organization is itself the

dispositive factor in deciding whether to treat inputs as self-produced.  Although arguing that

other factors such as operational integration do not establish organizational control, Commerce

has failed to sufficiently explain what organizational control itself has to do with the essential

issue of arriving at an accurate cost of production for the NME producer.  Therefore, this issue is

remanded to Commerce to reconsider its analysis of whether to apply the self-produced rule and,

if necessary, to revise its dumping margin calculations in accordance with this opinion.

Furthermore, Commerce has failed to respond to Plaintiff's second argument, that because

Jubilant is more vertically integrated than SVW, using its cost figures would greatly overstate

SVW's overhead. Accordingly, this issue is similarly remanded to Commerce to explain why

Jubilant is the appropriate surrogate, assuming the self-produced rule cannot be applied here.

**B.** **Value-Based Methodology Versus Heat of Combustion-Based Methodology**

SVW produces acetylene and acetylene tail gas. In its questionnaire responses, SVW

allocated the values of acetylene and acetylene tail gas by using their relative heats of

combustion. In its verification report, Commerce concluded:

> Company officials explained that acetylene tail gas is recorded as a co-product in
> its normal books and records and that all production costs are allocated between
> acetylene and acetylene tail gas in the ordinary course of business. Company
> officials provided a document from the SVW planning department showing the
> allocation methodology used. Company officials explained that the current
> methodology has been in place at SVW since December 1996. Commerce
> accepted this methodology for the preliminary determination.

*Id.* Commerce further noted:

> . . . acetylene tail gas is a significant product for SVW because it is used as the
> feedstock to produce methanol in the Methanol (I) plant, while acetylene is a
> significant product because it is the feedstock for VAM.

*Id.* For the final determination, however, Commerce continued to treat acetylene and acetylene

tail gas as co-products, but adopted a value-based allocation methodology. Commerce concluded

that

> we have determined that it is appropriate to reject SVW's allocation methodology
> because it does not reasonably reflect the costs associated with the production and
> sale of PVA, as required by the Act. . . . Accordingly for the final determination,

we re-allocated SVW's costs between acetylene and acetylene tail gas based on each product's relative market value.

*I&D Memo* at 18-1 9.

### 1.    Plaintiff's Arguments

Plaintiff contends that Commerce's decision to switch from a heat of combustion-based methodology to a value-based methodology was contrary to law and unsupported by substantial evidence on the record.  SVW argues that Commerce's discretion to select a methodology is not without restriction.  Instead, it relies upon *Shikoku Chems. Co. v. United States*, 16 CIT 382,795 F. Supp. 417 (1992), for the proposition that Commerce may not alter its methodology where a respondent has detrimentally relied upon a previous methodology developed by Commerce itself and used in prior proceedings.  Plaintiff alleges that Commerce, "by its own volition," utilized a heat of combustion methodology during its 1995 anti-dumping investigation against SVW.  *Pl.'s Brief* at 14.[2]  Moreover, Plaintiff claims that since that time, SVW has adopted that allocation methodology for its own accounting records and in the ordinary course of business.  Therefore, SVW claims that it detrimentally relied on Commerce's prior use of such methodology, and therefore, Commerce cannot switch methodologies for its final determination.

In addition, Plaintiff argues Commerce's decision to switch its allocation methodology is contrary to law because the statute requires Commerce to use the producer's records if they "are kept in accordance with generally accepted accounting principles of the exporting country."  *Pl.'s Brief* at 19, citing 19 U.S.C. §1677b(f)(1).  According to SVW, it incorporated western-style

---

[2] The court was not able to verify this claim by referencing Plaintiff's citation to the record.

accounting procedures after the 1995 investigation in order to avoid further dumping charges. *Pl.'s Brief* at 16. Therefore, Plaintiff argues that Commerce should have continued allocating values of acetylene and acetylene tail gas using their relative heats of combustion.

Moreover, Plaintiff contends that the use of the heat of combustion methodology is based on sound accounting and scientific principles, and thus provides an accurate, consistent, predictable and stable measure; while a value-based methodology is not an accurate allocation method for SVW because it "neither purchases nor sells these products." *Pl.'s Brief* at 22. Plaintiff further attests that a value-based methodology would reflect the ever changing prices of the two co-products, which has no effect on SVW's costs.

Finally, Plaintiff challenges the Department's use of surrogate values for acetylene and acetylene tail gas in its calculations. According to Plaintiff, Commerce was unable to find a surrogate market value for the two co-products, and therefore, it arrived at the value of acetylene tail gas by deducting the Indian surrogate's costs of all factors of producing methanol, except acetylene tail gas. In addition, SVW contends that there was a large discrepancy in the surrogate market value of acetylene provided by Petitioner and the value used in Commerce's calculation in the final determination. Therefore, Plaintiff argues that on remand Commerce should be instructed to recalculate SVW's costs using heat of combustion methodology to allocate values for acetylene and acetylene tail gas.

### 2.       Defendant's and Defendant-Intervenors' Arguments

According to Commerce, it decided to use a value-based methodology in order to account for a significant disparity between the values of acetylene and acetylene tail gas. *Def.'s Brief* at

14. Commerce asserts that it ordinarily calculates costs in accordance with respondent's books and records, if they are maintained according to the exporting country's generally accepted accounting principles ("GAAP") and they reasonably reflect actual costs. *Def.'s Brief* at 14. Commerce states that heat of combustion methodology is not an appropriate value allocation methodology, because SVW does not utilize the products as fuel, and therefore, their "heat generation properties" are irrelevant. *I & D Memo at 17.*

Commerce further argues that the heat of combustion methodology results in a majority of the costs being allocated to acetylene tail gas, while the market value of acetylene is 15 times greater than acetylene tail gas. Commerce contends, therefore, that its use of a different value based methodology is merely the use of more accurate and relevant data, and not a change in methodology as SVW suggests. Finally, Commerce argues that even if the court considers this to be a change in methodology, it should still uphold Commerce's decision, because it adequately explained and supported this decision with substantial evidence on the record.

Defendant-Intervenors additionally argue that although Commerce initially accepted SVW's heat-based methodology in its preliminary determination, it noted that the cost-allocation issue must be revisited before reaching any final decision. *Def. Intervenor's Brief* at 17 (citing *Concurrence Memorandum* at 13). Furthermore, Defendant-Intervenors argue that SVW misplaces its reliance on the final determination of the 1994-1995 investigation because, as Defendant-Intervenors argue, Commerce never considered the cost allocation issue in that investigation. Thus, Defendant-Intervenors argue that *Shikoku* is inapplicable because

Commerce did not create or ratify any cost allocation methodology upon which Plaintiff could have relied to its detriment.

### 3. Analysis

In *Shikoku*, this Court stated that in certain circumstances, principles of fairness prevent Commerce from changing its prior methodology. 795 F. Supp. at 388. Thus, this Court held that the parties have a right to rely on Commerce's consistent approach over successive annual reviews, and that Commerce could not alter its analysis at a "late stage" simply to effectuate a slight improvement. *Id.*

Plaintiff claims that in the 1995 antidumping investigation, Commerce, "on its own volition and without any input from the interested parties, determined that acetylene tail gas and acetylene were co-products and [Commerce] allocated costs between the co-products based upon their relative heats of combustion." *Pl.'s Brief* at 14 (citing *Polyvinyl Alcohol from the People's Republic of China*, 61 Fed. Reg. 14057-14063 (1996). This claim, however, is unsupported by any evidence in the record. SVW further cites to the verification report in support of the fact that Commerce indicated that it was informed by SVW officials that the heat of combustion-based methodology had been in place since December 1996. *Id.* (citing Verification Report at 15-16). While tending to establish how long SVW has employed its allocation methodology and perhaps even establishing contemporaneousness, this information does not indicate any reliance on any of Commerce's instructions – whether explicit or implicit – to apply such methodology. Upon questioning at oral argument, Plaintiff admitted that the Polyvinyl Alcohol decision in the Federal Register in fact does not contain any record evidence of the instructions from Commerce

it claims to have relied on in the instant case. *See Oral Arg. Tr.* at 9, 11-12. Rather, Plaintiff

indicated that evidence of its reliance interest is located in the preliminary determination in this

case, which is unavailing. *Id.* at 9. Furthermore, Plaintiff itself indicated that it had no

knowledge of Commerce's decision to treat acetylene and acetylene tail gas as co-products, and

that it based its decision to do so not because of Commerce's decision, but because of the change

in Chinese accounting procedures to follow western accounting practices, specifically GAAP.

*Rebuttal Brief of Sinopec Sichuan Vinylon Works* at 8 (*Appendix to Brief in Support of Pl.'s Mot.*

*for J. on the Agency Record, Tab 7*).

Without any evidence to support its claim that "it was [Commerce] that first applied the

heat of combustion allocation methodology upon SVW to the two co-products in the 1995

antidumping investigation," and that "SVW subsequently adopted that methodology in its

ordinary course of business so as to minimize potential antidumping duty liability," SVW's

reliance on *Shikoku* is misplaced. The court declines to assume, as Plaintiff suggests, that simply

because SVW adopted the allocation methodology in 1996, it did so at Commerce's direction.

Furthermore, Commerce has explained that allocating costs solely on the basis of

potential heats of combustion, when neither acetylene nor tail gas is used by SVW for its heat-

generating properties, is unreasonable given the vastly different market values of the two co-

products. Thus, as Commerce argues, adopting a value-based allocation methodology more

accurately reflects SVW's costs. Under its deferential standard of review, this court must affirm

Commerce's findings when they are supported by substantial evidence on the record, as has been

established here. *See Fujitsu*, 88 F.3d at 1038. Thus, because SVW has failed to direct the court

to any record evidence to show that it relied on Commerce's direction in adopting the heat of combustion allocation methodology, and because the court finds that Commerce has articulated a reasonable rationale for adopting a value-based allocation methodology, Commerce's determination to do so is affirmed.

**C.      Calculation of Surrogate Value for Natural Gas**

In calculating the normal value of the production of polyvinyl alcohol, Commerce used a surrogate value for natural gas, a raw material input used in the production process. Commerce preliminarily used surrogate values obtained from the Gas Authority of India, Ltd. ("GAIL"). In the Final Results, Commerce continued to use the GAIL figures, but used only the reported ceiling prices. Plaintiff challenges this action, arguing that Commerce should use an average of the reported ceiling and floor prices for natural gas as a surrogate price in its normal value calculation. Commerce admits that it is unclear whether it analyzed averaging the GAIL prices and requests a voluntarily remand on this issue for further analysis. The court agrees and grants Commerce's request.

**D.      Application of the By-Product Credit**

When calculating normal value in the final determination, Commerce applied Jubilant's financial ratios to SVW's materials, labor and energy expenses before making any offset for SVW's recovery of acetic acid during the final stage of the PVA production process. Commerce determined that Jubilant is a producer of PVAc, a constituent of partially hydrolyzed PVA and the precursor to fully hydrolyzed PVA, but does not produce PVA itself. Thus, PVAc manufactured by Jubilant does not undergo the final step in the process used to produce PVA.

During this final stage of PVA production, PVAc is hydrolyzed into PVA, resulting in the release of methyl acetate, from which acetic acid is recovered. This acetic acid can be recycled and used as an offset against production costs, as is done by SVW. Because the PVAc manufactured by Jubilant did not undergo this final production stage, Commerce concluded that the denominator of the financial ratios did not account for these by-products. Therefore, Commerce applied Jubilant's financial ratios to SVW's costs prior to making any offset for the recovery of acetic acid, ostensibly in order to equate the base on which the ratios were calculated with the base to which they were applied.

### 1. Plaintiff's Arguments

SVW argues that this methodology inflates its costs beyond their actual level, and is therefore inappropriate. SVW argues that Commerce should instead follow its standard practice of applying overhead, SG&A, and profit only after giving full credit to SVW for its recovered acetic acid. Moreover, SVW claims that while Commerce has adjusted overhead in the past, it radically departs from past practice in adjusting SG&A and profit. Because these factors have no relationship to the level of integration in SVW's production process, SVW argues that these amounts should be calculated only after the by-product offset has been made.

Plaintiff bases its argument, that Commerce's decision to apply the by-product credit after applying Jubilant's financial ratios would significantly overstate SVW's costs, on two basic premises. First, Plaintiff argues that evidence on the record indicates that Jubilant's capital costs include capital costs associated with the production of acetic acid in its production facility – a process that Plaintiff itself does not undergo. Therefore, SVW argues, Jubilant's overhead,

SG&A and profit ratios used by Commerce include the capital costs, operation and maintenance of an acetic acid production plant, which is not included in SVW's costs. Second, Plaintiff argues that the SG&A profit ratios of Jubilant are overstated as compared to SVW because Jubilant sells more products and by-products, including acetic acid, than SVW.

Plaintiff also claims that Commerce violated generally accepted accounting principles by not applying the credit for recycled acetic acid during the PVA hydrolysis stage in the calculation of its overhead, SG&A and profit. In essence, Plaintiff argues that by refusing to give it a credit for the recycled acetic acid when calculating the overhead, SG&A and profit, Commerce is effectively making SVW's recycled acetic acid a direct cost of manufacturing whereas "it is clearly not 'part of the cost object.'" Instead, Plaintiff argues, the recycled acetic acid should be treated as an asset that is included within inventory.

Moreover, Plaintiff claims that because Commerce refused to consider its purchases of acetic acid from the affiliated joint venture partner as "self-produced" inputs, using surrogate prices for Plaintiff's acetic acid inputs results in the double-counting of those inputs. Thus, although Commerce did provide a by-product credit, SVW argues that deduction of the credit from the calculated normal value, rather than from manufacturing costs, still resulted in inflated SG&A and overhead costs.

### 2.     Defendant's and Defendant-Intervenors' Arguments

Defendant responds that while it found both companies, Jubilant and SVW to be at equivalent levels of vertical integration, it nonetheless found that sufficient differences existed in the production process which, if not accounted for, would result in the understatement of factory

overhead, SG&A, and profit. Specifically, Defendant indicated in its decision memorandum

that:

> the difference in overhead percentages cited by petitioners appears to be a direct
> result of a difference in the relative material costs associated with the two
> processes, not their relative capital intensity or degree of vertical integration.

*I&D Memo* at 27. Thus, Defendant explained:

> [G]iven the denominator of the overhead ratio does not appear to account for
> significant by-products generated during the PVA process, we recommend
> applying Jubilant's overhead ratio to SVW's total material, labor, and energy costs
> prior to making any offset for the recovery of acetic acid. Because the same
> principle holds true for Jubilant's SG&A and profit ratios, we further recommend
> applying these ratios to SVW's costs prior to the offset for acetic acid as well.

*Id.*

Therefore, the quantities of acetic acid recovered by the two companies are not equivalent

and to treat them as if they were would not be appropriate. *Id.* at 28. Commerce further stated

that

> because Jubilant does not recover acetic acid in the final stage, the financial ratios
> calculated using Jubilant's data do not account for the significant acetic acid
> by-product credit claimed by SVW. In order to fully capture the overhead
> associated with the production of PVA, therefore, it is necessary to apply these
> ratios to the same base of costs used in the denominator of the calculation (i.e.
> materials costs incurred prior to the final production stage, energy, and labor). We
> disagree with SVW that this issue is one of integration; rather, it is a question of
> simple mathematics.

*Id.* Furthermore, Defendant argues that no statute mandates that it apply the by-product credit in

the manner Plaintiff proposes - i.e., before determining factory overhead or adding SG&A and

profit. Because Commerce found that SVW's proposed methodology would artificially reduce

normal value by imputing overhead costs to SVW's recovery of acetic acid despite the fact that

Jubilant did not incur overhead costs for the recovery of acetic acid, Commerce declined to follow SVW's methodology.

Defendant-Intervenors' further argue that Jubilant produces more by-products than SVW and therefore has potentially inflated costs relative to SVW. Additionally, Intervenors respond to Plaintiff's argument that SVW has greater costs because it produces more products and by-products than SVW, by arguing that the number of by-products a company produces should not determine whether that company is viewed as a more integrated producer generating larger amounts of overhead. Finally, Intervenors argue that Commerce has been completely consistent in applying its principle that it will contemplate adjustments to SVW's direct cost base to account for important differences in production processes, but will not adjust surrogate financial ratios, because its decision to make adjustments to SVW's cost base was premised on accounting for SVW's recovery of acetic acid.

### 3.      Analysis

The court notes from the outset that the statute and regulations are silent with respect to how Commerce is to account for by-product credits. Commerce's decision, however, must be supported by substantial evidence on the record. *Fujitsu*, 88 F.3d at 1038. In the case at bar, Commerce's calculation properly accounts for SVW's recovery of acetic acid. It does not, however, adequately consider the differing levels of integration and the fact that Jubilant's overhead costs are not representative of SVW's.

Commerce's decision to apply the by-product credit for acetic acid recovery after applying Jubilant's financial ratios to SVW's costs is supported by its finding – a finding that

Plaintiff does not disagree with – that "SVW recovers a significant quantity of acetic acid during the final hydrolysis stage, while Jubilant does not hydrolyze PVAc into PVA."  During the stage of the production process when Jubilant produces ethylene and before SVW produces acetylene the total cost per pound before recovery of acetic acid for each company is comparable, and therefore, Commerce's decision to compare the two companies at this stage is supported by the record.  *See* 19 U.S.C. 1677b(c); *Cf. Yantai Oriental Juice Co. v. United States*, 27 CIT __, Slip Op. 03-150 ("Commerce must capture all of the costs of production no matter how characterized").  Applying the by-product credit before applying Jubilant's financial ratios would, as Commerce argues, mischaracterize SVW's cost of production because Jubilant's production process does not include the hydrolysis step where acetic acid is recovered.

Plaintiff argues, however, that because Jubilant produces its own acetic acid and SVW does not, Jubilant is more vertically integrated and therefore incurs greater costs.  Thus, Plaintiff argues that by deducting the by-product offset after the application of the financial ratios, overhead, SG&A and profit costs are inflated above what they would be for a company that produces PVA in the way SVW does, thereby substantially overstating SVW's normal value.  Because Jubilant produces its own acetic acid and because Jubilant produces more products than SVW, Plaintiff argues that Commerce should apply the by-product credit before applying Jubilant's financial ratios in order to control for these disparities.  Plaintiff's approach would misapply the by-product credit.

Commerce applied the by-product credit to account for the fact that SVW recovers and reuses acetic acid in its PVA production process.  *See Self-Produced Inputs Memorandum* at 12-

14 (*Appendix* tab 10). Thus, the by-product credit corresponds to the amount and value of acetic acid recovered by SVW in its production process, not the cost of Jubilant's upstream production of acetic acid or the costs associated with the other products and by-products produced by SVW. Commerce's decision to apply financial ratios calculated from Jubilant's data to Plaintiff's cost before applying the by-product credit will not be disturbed by the court.

Although Commerce has sufficiently supported its decision to apply the by-product credit after applying Jubilant's financial ratios, it has not sufficiently explained its decision to apply Jubilant's financial ratios without accounting for the greater costs incurred by Jubilant during its production of acetic acid, a process which Commerce has determined SVW does not undergo. As Plaintiff points out, Jubilant's capital costs include capital costs associated with its production of acetic acid in its production facility. Thus, it is likely that Jubilant's overhead is overstated as to Plaintiff's overhead because Jubilant's overhead includes the capital costs associated with its production of acetic acid. Moreover, because Jubilant sells more products and by-products than SVW, it is likely that the SG&A and profit ratios of Jubilant will also be overstated compared to SVW. Although Defendant-Intervenors argue that the number of by-products a company produces is not probative of whether that company should be viewed as a more integrated producer generating larger amounts of overhead, Commerce has failed to respond sufficiently to Plaintiff's arguments and to adequately explain its decision not to account for these potentially significant disparities in its calculations. Therefore, this issue is remanded to Commerce to explain its rationale or to recalculate normal value after making the appropriate adjustments.

### IV. CONCLUSION

In conclusion, this matter is remanded to the Department of Commerce for further proceedings consistent with this opinion with regard to application of the "self-produced rule" (issue 1), the use of the ceiling price of published GAIL prices as the surrogate for natural gas (issue 3), and Commerce's decision to apply Jubilant's financial ratios without accounting for disparities in the cost of manufacturing (issue 4). Commerce's use of a value-based methodology to allocate costs between acetylene and acetylene tail gas (issue 2) is affirmed.

Commerce shall have sixty (60) days, until June 6, 2005 to complete and file its review. Plaintiff shall have thirty (30) days from that filing to file comment(s), and any reply by Commerce shall be due twenty (20) days after Plaintiff's comment(s) are filed.

April 4, 2005 /s/ Judith M. Barzilay

Dated:_____ _____

New York, NY Judith M. Barzilay, Judge